Jewel E. Boyd and Lela L. Boyd v. Commissioner.
Boyd v. Commissioner
Docket No. 3951-66.
United States Tax Court
T.C. Memo 1970-183; 1970 Tax Ct. Memo LEXIS 172; 29 T.C.M. (CCH) 828; T.C.M. (RIA) 70183; June 30, 1970, Filed Brooks L. Harman, American Bank of Commerce Bldg., Odessa, Tex. *173 , for the petitioners. Harold L. Cook and Norman Pickett, for the respondent. 829 FEATHERSTON
Memorandum Findings of Fact and Opinion FEATHERSTON, Judge: Respondent determined deficiencies in petitioners' income tax and additions thereto under section 6653 (b) [1] as follows: Taxable Year
Deficiencies
Additions to the Tax Sec. 6653(b)
1957
$1,949.92
$ 974.96
1958
2,700.04
1,381.37
1959
4,580.68
2,290.34
1960
646.14
323.07
The issues presented for decision are: (1) Whether any or all of petitioners' joint income tax returns for 1957 through 1960 were "false or fraudulent [returns] with the intent to evade tax" within the meaning of section 6501(c)(1), so as to remove the bar of the statute of limitations provided by section 6501(a); alternatively as to 1959 and 1960, whether petitioners' returns omitted 25 percent or more of the amount of their gross income for such years, with the result that the six-year statute of limitations prescribed by section 6501(e) is applicable; (2) Whether any part of any underpayment of *174 tax required to be shown on petitioners' income tax returns for each of the years 1957 through 1960 was "due to fraud," thus authorizing the additions to tax prescribed by section 6653(b); and (3) If the assessment of deficiencies for 1957 through 1960 is not barred by section 6501(a), what were the amounts, if any, of the understatements of income for those years? Findings of Fact Jewel E. Boyd and Lela L. Boyd, husband and wife, were legal residents of Midland, Texas, at the time their petition was filed. They filed their joint income tax returns for 1957 through 1960 with the district director of internal revenue at Dallas, Texas. Jewel E. Boyd will be referred to as petitioner. Petitioner was born March 23, 1907, and was graduated from high school in 1926. Thereafter he attended Draughon's Business College. He worked at various jobs in the West Texas oil fields and began employment with the Gulf Oil Company (hereinafter Gulf) in April 1936. On July 1, 1949, he was promoted to production foreman on the Goldsmith Lease in ector County, Texas; he held this position until April 22, 1960. Gulf's Goldsmith Lease covered approximately 35 square miles. Oil was produced from four *175 different formations or levels. To maintain the pumps, lines, tanks, and other facilities on the Lease, Gulf employed about 100 workers - pumpers, roustabouts, etc. - and retained the services of contractors to perform specialized services. Petitioner and three other foremen had the responsibility for supervising the work of the Gulf employees and making and processing work assignments to the contractors. Petitioner was primarily responsible for production from the San Andres formation. One of the other foremen filled in for him when he was away. The foremen had their office in a building located on the Lease. Petitioner spent most of his time in this office, but periodically made the rounds of the Lease area and checked on work in progress. He ordinarily did not stay any substantial length of time at a work site unless the crew was experiencing difficulty. Petitioner and the other foremen depended upon Gulf employees - particularly the pumpers - to report special service work that needed to be done. The service work included the removal of paraffin from flowing wells, steaming and repairing flow lines, repairing leaks, servicing separators, treating, hauling, and disposing of oil, *176 oiling roads, and the like. When the need for service work was reported, petitioner or one of the other foremen had the responsibility for selecting the contractor to do the work. To qualify to do service work, a contractor was required first to enter into a blanket contract with Gulf's district office in Midland, Texas. The terms of these contracts included price sheets for particular kinds of work, certificates of workmen's compensation insurance coverage, and other provisions. To obtain work assignments, the qualified contractors sent "pushers" to the office of the Gulf foremen. The pushers, in effect, served as salesmen in promoting work assignments for their contractors. At any given time crews from six or seven contractors were working on the wells on the Goldsmith Lease. The foremen, including petitioner, assigned work to a contractor by delivering a "work ticket" to a pusher, describing the 830 services to be performed and designating the well by number. The contractor then dispatched a work crew to the well site and, upon completing the assignment, prepared and sent to the foreman a "field ticket," which described the job and the number of man hours required to do *177 it. The foreman then issued to the contractor an approved, numbered "work order" containing a description of the services which had been performed. The contractor thereupon prepared an invoice, supported by the work order, and forwarded it to Gulf for payment. Individual field tickets, work orders, and invoices frequently covered several work assignments - often all the work performed by the contractor during a stated period. During 1957 through 1960 several contractors submitted invoices to Gulf, supported by work orders approved by petitioner, which included billings for work which they had not actually performed, and they received payment thereon. The following table summarizes the payments made on such false billings: Payee
1957
1958
1959
1960
Para Serv. Co.
$6,318.83
$ 5,690.75
$ 2,875.96
$ 683.15
Paraffin Service Co.
743.75
675.00
447.23
100.00
J. C. West Const. Co.
900.00
2,000.00
3,800.00
300.00
Goldsmith Well Serv. Co.
148.63
1,680.00
1,100.00
O. A. Palmer
2,000.00
500.00
Tireco
140.00
Roy's Welding Service
2,315.24
J. A. Barber
2,200.00
Taylor Garage
1,107.68
G. Q. Salmon Co.
800.00
Total
$7,962.58
$10,514.38
$15,866.11
$2,183.15
*178 Upon receipt of payments which included the foregoing amounts, the contractors issued checks to their pushers, who cashed the checks by endorsing them to local grocery stores, liquor stores, country clubs, and business establishments in which the payees had an interest and, in some instances, endorsing them "For deposit only." One individual was the principal stockholder and officer in Para Serv. Co., Paraffin Service Co., Goldsmith Well Servicing Co., and a partner in Tireco; several of the pushers worked for all of these firms. O.A. Palmer, in addition to working for these firms, also worked for G.Q. Salmon Co. during part of the period in controversy. In late December 1959 Gulf dispatched two security investigators, aided by a group of auditors, to investigate charges of irregularities in the management of the Goldsmith Lease. Subsequently, Gulf made claims against the above-described contractors, for which Gulf accepted about $20,000 in settlement on or before April 5, 1960. The investigators interviewed petitioner on this latter date. Petitioner's employment with Gulf terminated on April 22, 1960. In 1962 Gulf refunded to petitioner moneys which he had contributed to an annuity *179 fund during his 24 years of employment with the company. Petitioner was tried in the United States District Court for the Western District of Texas in March 1966 on a charge of willfully attempting to evade and defeat a substantial part of his and his wife's joint income tax for 1957, 1958, and 1959 by filing false and fraudulent returns in violation of section 7201. He was acquitted by a jury on each of the three counts. Respondent determined that the sums paid by Gulf to the contractors on invoices submitted by them, set forth in the foregoing table, were taxable to petitioner for 1957 through 1960, that his returns for those years were false and fraudulent, and that part of the underpayments of tax was due to fraud. Opinion By virtue of section 7454(a) respondent had the burden of proving, by clear and convincing evidence, Drieborg v. Commissioner, 225 F. 2d 216, 218 (C.A. 6, 1955), reversing on another issue a Memorandum Opinion of this Court that for 1957 through 1960 petitioners filed "false or fraudulent [returns] with the intent to evade tax" within the meaning of section 6501(c)(1). Alternatively as to 1959 and 1960, respondent was required to prove *180 that petitioners' returns omitted 25 percent or more of their gross income for those years in order to make section 6501(e) applicable, C. A. Reis, 1 T.C. 9 (1942), affirmed on other 831 issues 142 F. 2d 900 (C.A. 6, 1944). Otherwise, assessment of the determined deficiencies is barred by the three-year limitations period prescribed by section 6501(a). Furthermore, to sustain the additions to the tax under section 6653 (b), respondent was required similarly to show that at least part of any underpayment for each year was "due to fraud." Respondent contends that he has carried his burden of proof by showing that petitioner received substantial amounts of "kickback" income from Gulf customers which he knowingly omitted from his returns with an intent to avoid paying income tax thereon. Petitioner does not deny that failure to report kickback income would have been fraudulent. Rather he takes the simple, forthright position that he did not receive any kickback income. His counsel states petitioner's position succinctly: If the Court should find that "he got the money, then it is fraud; if he didn't get the money," then the statute of limitations and penalty *181 provisions are "out of the picture." The decision of the case then turns on this single, crucial question: Did petitioner receive the alleged kickbacks from Gulf customers? Before turning to an analysis of the evidence, we observe that our conclusion is not controlled by the jury verdict that petitioner was innocent of the charge under section 7201 of fraudulently attempting to evade and defeat the tax for the first three of the four years in controversy. The Government's burden of proof in the criminal case was more onerous, and collateral estoppel does not apply. See Helvering v. Mitchell 303 U.S. 391 (1938). Although the trial record here is, generally speaking, similar to that in the criminal proceeding, two triers of fact may properly reach opposite ultimate findings on the same record and each has a duty to weigh and consider the evidence and make an independent evaluation thereof. Kellems v. United States 97 F. Supp. 681, 684 (D. Conn. 1951). Respondent produced witnesses who gave testimony which, if fully accepted, would prove that petitioner received kickback income. Any fair evaluation of that testimony, we agree, would require the conclusion *182 that Gulf was the victim of a fraudulent scheme. The record is clear that certain contractors submitted invoices to Gulf claiming compensation for work which, in part, was not actually done, and that Gulf issued checks in payment thereof. By issuing approved work orders reflected in these invoices, petitioner was instrumental in causing the checks to be issued. But respondent has failed, in our view, to show convincingly that the contractors turned the proceeds of the fraud over to petitioner. Some 100 men worked under the supervision of petitioner and three other foremen. Many of them had the responsibility for reporting problems requiring special services. Petitioner spent most of his time in an office occupied by himself and the other three foremen and necessarily depended on men working under his supervision for information needed for the approval of work orders. With six or seven contractors working continuously at various locations on the Lease, the volume of petitioner's paper work, along with his supervisory duties, was substantial. The record is reasonably clear that many, if not all, of the fraudulent transactions were documented by papers covering some work which was actually *183 done as well as the false claims, thus requiring careful study on petitioner's part to avoid mistakes. On review of the whole record we do not think respondent has shown that petitioner's approval of false work orders was not due to carelessness or inadvertence. [2]
Respondent's case to the contrary is built on the testimony of the representatives of contractors who were confessedly active participants in the scheme to defraud Gulf. To sustain respondent we must find that the contractors first received the Gulf checks for the partially false invoices and then issued checks of their own to the pushers and, further, that the pushers cashed their checks - some of which bore endorsements of liquor stores, country clubs, or business establishments in which the payees held an interest, while others were endorsed "For deposit only" - and later turned the proceeds *184 over to petitioner. The Internal Revenue Service investigated none of the contractors or pushers for fraud on the revenue, despite their conceded wrongdoing; the possibility that the pushers or contractors kept the proceeds of these checks has not been negated. The admitted moral flexibility and obvious self-interest of the contractors and the pushers in attributing to someone else 832 the enjoyment of the fruits of the fraud invite careful scrutiny of their testimony and call for meaningful corroboration. While the number of witnesses who testified that they participated in the fraudulent scheme alone provides some support for the case against petitioner, these individuals, as noted in our Findings, were a close-knit group. We think that, to carry weight, corroboration of their testimony must come from other sources. True, a Gulf investigator testified that petitioner admitted to him on April 5, 1960, that he received $4,000 to $5,000 in kickbacks. Petitioner flatly denied that he made this admission, and the unusual manner in which the interview was conducted has led us to give it little weight. The investigator asked petitioner no questions as to the specific sources of alleged *185 kickbacks or his dealings with any individual contractors. He neither requested nor obtained any written statement from petitioner. Indeed, the investigator admitted that his primary purpose was not to elicit information - Gulf had already settled its claims against the contractors - but to be sure "that Mr. Boyd knew what he was in trouble for." Approval of the fictitious invoices for payment, in any event, even without receiving the fruits thereof, would presumably have been "trouble" enough to justify Gulf's dismissal of petitioner. No explanation appears in the record as to why, if petitioner was the real culprit in the fraudulent scheme, a wall of silence was built around him during the period, December 1959 through April 1960, when Gulf was investigating irregularities and settling its resulting claims against the contractors. There is no suggestion that Gulf was making an effort to build a criminal case against petitioner under state law or that he was ever prosecuted for such a violation. Before accepting the $20,000 settlement with the contractors, we think it only reasonable that the Gulf investigators, if they had thought petitioner was the central figure, would have confronted *186 him with their findings to ascertain, or at least to verify, the extent of the fraud. Yet the implication is that Boyd was never interviewed at all regarding the matter, until the case was apparently about to be closed. More significant, we think, is the fact that when Gulf completed its investigations, it demanded and received repayment from the contractors rather than petitioner. Indeed, there is no suggestion that either Gulf or the contractors ever made any demand upon petitioner for restitution of the alleged kickbacks. The only conversation petitioner had with the contractors after he left Gulf's employment, described in the record, was one following the initiation of the Internal Revenue Service's investigation, and at that time petitioner told one of the contractor's representatives, among other things, that he would "make a liar" out of anyone who had implicated him. That Gulf was not satisfied that petitioner was the ultimate beneficiary of the fradulent scheme is confirmed by its refund, albeit after petitioner had employed an attorney to assist him, in 1962 of contributions which he had made to an annuity fund during his 24 years of employment. The failure of anyone *187 to make a reimbursement claim against petitioner takes on added significance when viewed in the light of his repeated coupling of persistent, unqualified denials that he participated in the fraudulent payments with challenges to the Internal Revenue Service to show that he ever spent any money which was not his. According to respondent's determination, the alleged kickbacks exceeded petitioner's wages and all other income during the four years in controversy. Yet the special agent admitted that his thorough investigations of petitioner uncovered no "active social life," no membership in country clubs, and no "unusual or high-cost habits," and that extensive searches of public, bank, and similar records failed to uncover any acquisitions of property or transactions of any kind which would explain the receipt of the alleged kickbacks. Petitioner demonstrated that during the four years in question he withdrew the cash surrender value of his insurance policies, cashed an accumulation of Government bonds, borrowed money from the Gulf Credit Union, and that his children worked to raise money to help defray their school and other expenses. At the trial before this Court the revenue agent *188 testified that few, if any, of petitioner's checks on his bank account (freely furnished to the revenue agent at one stage of the investigation, but later destroyed in a fire) covered grocery, dry cleaning, and other routine living expenses, thus suggesting that the alleged kickbacks were used to defray this type of expense. But the special agent testified to the contrary at the criminal trial - that his analysis of the checks showed that they covered living expenses. 833 Petitioner's income level was not high enough for the alleged kickbacks totaling $36,526.22 to have made no noticeable difference. It is only reasonable that these amounts - so large in relation to his income - would have surfaced at some point. Not only do his expenditures during the years in question fail to corroborate any unlawful receipts, but his standard of living subsequent to leaving Gulf's employ - working first as a handyman for his brother and later as a motel manager at a salary of about $130 per month - provides no support for a theory that he secreted his allegedly illgotten gains. At least one other circumstance raises serious questions as to the reliability of the contractors' testimony. Among *189 the checks identified by five of the Government's key witnesses as having been given in furtherance of the fraudulent scheme were 19 checks dated after Gulf's investigation began in December 1959. The Gulf investigators' explanation of their techniques shows they examined the contractors' records to determine whether the contractors paid their employees wages for work described on the fraudulent invoices. The contractors thus knew they were being investigated or had already made settlement payments to Gulf when these five crucial witnesses say they were making payoffs to the petitioner. Indeed, four of the checks were dated after petitioner left Gulf's employ. After careful consideration of the entire record in this proceeding, we conclude that respondent has failed to show that petitioners omitted 25 percent or more of the amount of their gross income for 1959 and 1960 and he has failed to show by clear and convincing evidence that any of their income tax returns for 1957 through 1960 were "false and fraudulent" within the meaning of section 6501(c)(1) or that any part of the determined underpayments of tax was "due to fraud" within the meaning of section 6653(b). Decision will *190 be entered for the petitioners. Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended, unless otherwise noted.↩
2. The real possibility of errors in handling these transactions is illustrated by the experience of G.Q. Salmon. He denied that he was a party to a scheme to defraud Gulf but paid Gulf's claim for reimbursement when his pusher admitted that false invoices had been forwarded to Gulf for payment without Salmon's knowledge.↩